FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

04 AUG -4 AM 11:57

U.S. DISTRICT COURT
N.D. OF ALABAMA

SHARON D. MATTHEWS,         )
                            )
        Plaintiff,          )
                            )
v.                          )   CIVIL ACTION NO. 01-RRA-0535-NE
                            )
COMPUTER SCIENCES CORP,     )
                            )
        Defendant.          )

ENTERED
AUG - 4 2004

MEMORANDUM OF DECISION

This is a race discrimination action. The plaintiff, a black woman, became employed with the defendant in March, 1989. The complaint alleges that beginning in May, 1999, until she left the defendant's employ in July, 2000, the plaintiff's employment suffered as the result of several discriminatory acts. Before the court is the defendant's motion for summary judgment. Both parties have submitted briefs and other submissions. The court's ruling will be based on the summary judgement evidence specifically set out and argued by the parties. The court has considered all the evidence, although not all of it may be stated in this memorandum of decision. Of course, the plaintiff's verison of all disputed evidence will be taken as true. The parties are in accord as to the familiar, applicable law.

Evidence

The plaintiff was hired as an administrative assistant, as support for an army task for the defendant's (CSC's) Federal Sector at Redstone Arsenal, Alabama, with a salary of $18,000.00 per year. She continued to support various CSC-Army tasks until some time in

March, 1998, when Ralph Weber, the plaintiff's supervisor, and John Reitzel, Weber's supervisor, told the plaintiff that, due to lack of funding, her job was in jeopardy and she was subject to being laid off. Paul Freeman, Operations Director for CSC's SETAC contract, gave the plaintiff's resume to Jay Wilson, a manager within Freeman's organization who was seeking to fill newly created administrative support positions. The plaintiff was contacted about one of those positions by Betty Campbell, the plaintiff's human resources director. Wilson interviewed the plaintiff, but, feeling that she was overqualified, the plaintiff withdrew her name and decided to accept lay-off. Campbell, however, asked the plaintiff to reconsider, at least until she found a better opportunity. The plaintiff did, and she began working for Wilson in March, 1998.

In the fall of 1998, the plaintiff stated that she wanted to move from this strictly administrative support role to a job which held greater promise of advancement. In response, Freeman moved the plaintiff, in December, 1998, into a half-time position in the Program Control Group,[1] where the plaintiff became acquainted with Sandra Brand. Brand worked at the defendant's facility, but was employed by Inter Tech, one of the defendant's subcontractors on the SETAC contract. Candace Noneman, another of the defendant's subcontractors in the Program Support Group, supervised the plaintiff. This department did graphics work.

In January or February of 1999, Freeman told the plaintiff and another CSC employee, Donnie Stewart, who is also black, of two newly-created professional positions. One position

---

[1]There was not sufficient funding in this department to employ the plaintiff full-time, so Freeman allowed the plaintiff to bill half of her time to his overhead account.

was in Program Control, and the other was in Business Development, with reporting to Oliver Ozment. Freeman knew that both the plaintiff and Stewart desired opportunities for professional growth, and sought them out for these jobs in order to reward them for their hard work and achievement. Stewart chose the Program Control Position, which carried the title of "Associate Member of the Professional Staff," while the plaintiff chose the Business Development position, with the title of "Member of the Professional Staff." The plaintiff received a pay raise of approximately ten (10) percent. At the time the plaintiff made her choice, she viewed the position she chose as being the higher of the two positions. She received two additional pay increases within the last fifteen months of her employment.

The plaintiff states that Ozment, the last person to whom the plaintiff reported and who left the company in March, 2000, led the plaintiff to believe the job in Business Development, would provide valuable training and experience. The plaintiff's duties included doing marketing research; providing public relations support for local trade shows; coordinating the details for trade shows and local advertisements; assisting in the development and preparation of briefings to be presented in-house and to customers; analysis of the Army Aviation and Missile Command "AMCOM" Omnibus 2000 procurement bidders' library; the collection of data from several CSC Lotus Notes databases; and assisting with the Mentor Protege Program. The defendant paid for most, if not all, of the plaintiff's post-secondary education.

Approximately a month after the plaintiff's promotion, the defendant hired Brand to work in the department the plaintiff had just left. Brand continued to perform the same functions she had performed as a subcontractor. Brand's salary remained exactly the same,

and, in accordance with the defendant's hiring procedures, Dick Savage, who was Freeman's deputy, determined a title for Brand commensurate with her pay, "Senior Member of the Professional Staff." The plaintiff was aware of the posting of this position, and conferred with Freeman about the job. She decided, however, not to apply for it, because she was grateful to Freeman for having gotten the plaintiff her position in Business Development. Therefore, the plaintiff remained in Business Development and tailored some of her CSC-funded college course work toward the marketing aspects of her new position. After approximately six or seven months, the plaintiff expressed dissatisfaction with her job to Ozment. The plaintiff was also concerned about the defendant's hiring of outside persons to fill graphics positions and other Program Control positions. However, she neither applied for nor informed anyone that she desired to return to graphics or any other position in Program Control. She testified:

> Oh, it was that - - after I had talked to Mr. Ozment and Mr. Savage about the job - - about being dissatisfied with the job that I had - - and then after they brought people in and didn't post the jobs - - to me that was - - and I took it - - it was a personal thing to me, because they were bringing in people - - even though I may not have expressed to them the interest in wanting those jobs, I feel like as managers they should have posted those jobs.

*Plaintiff's Deposition*, p. 167.

In November, 1999, the defendant acquired Nichols Research Corporation and announced that it would be merging Nichols' Huntsville operations with CSC's Huntsville army operations. As a result of the merger, numerous Nichols and CSC employees were laid-off, including Ozment, who is white, on March 31, 2000.[2] The plaintiff received her lay-off

---

[2] Ozment had been a CSC employee for about five years, and CSC had acquired Ozment's former employer. He was thus considered a long term CSC employee.

notice in June, 2000. Freeman, however, granted the plaintiff leave to look for another position within CSC, and took it upon himself to look for another position for her. Freeman set up an interview for the plaintiff with a CSC contract administrator, e-mailed numerous CSC directors and vice presidents, contacted Human Resources, and even spoke with employers outside CSC on the plaintiff's behalf. Freeman's efforts were unavailing, and the plaintiff was laid off in July, 2000. When the plaintiff left CSC, she was making $36,000, twice her starting pay.

The plaintiff's declaration was disallowed, in part, in the court's ruling on the plaintiff's motion to allow the submission of that and other documents.[3] That declaration and certain additional evidence are set out in the discussion of the issues.

## Discussion

The defendant discusses more issues than the plaintiff does in her brief. The court has considered all issues stated by both parties.

*Promotion from Program Support Group to Business Development*: According to the plaintiff, Freeman "deceived [her] with regard to the possibilities for advancement," *Plaintiff's Declaration*, p. 3., and "enticed" her into giving up her job in graphics by advising the plaintiff that going to Business Development would put her on a path to advancement, *id*. at 2. Based upon what Freeman and Ozment told her, the plaintiff expected the job in Business Development to provide valuable training and experience and a way to advance in her

---

[3]Certain parts of the rest of the declaration are conclusory or conjectural.

employment with the defendant. However, she had little opportunity to gain worthwhile training or experience. The plaintiff further states that the position she left "turned out to be" a stepping stone for the advancement of Brand, who was hired into SETAC graphics to perform the managerial duties and responsibilities formerly handled by Noneman, approximately a month after the plaintiff left that department. *Id.* at 3. The plaintiff declares that she did not seek to vacate her position in SETAC graphics, rather Freeman approached her about changing jobs. She states that she would not have left her job in SETAC graphics if she had known that a promotion in that department would be opening up in the near future, a job she would have preferred to either of the two jobs Freeman urged her to consider. The plaintiff surmises that only someone in management, such as Freeman, would have known that Noneman was about to leave and that Noneman's position was to be converted to a CSC job. The plaintiff claims she was easily misled because Noneman worked for a subcontractor. This discrimination claim rests upon Freeman's actions being based on his desire to bring Brand into graphics and get the plaintiff out, so that he could advance Brand rather than the plaintiff, because of race.

With respect to the Brand job itself, the plaintiff cannot make out a prima facie case because she never applied for the position. In fact, the plaintiff, out of gratitude she felt for Freeman for getting her a position in Business Development, said that she did not want the Brand job about which she now complains. With respect to the plaintiff's contention that she was tricked into leaving her position in graphics because of her race, the evidence is clear that the plaintiff expressed to management a desire to advance. She testified:

    Q.    What about outside?

A.  Yes, ultimately. That's why I was getting my master's degree, because I wanted to move on to a professional job.

Q.  Outside of CSC?

A.  Or within if I had the opportunity. But I never spoke with anyone within CSC about helping me get something within CSC.

Q.  All right. So at the time you accepted the transfer onto Jay Wilson's staff, you did not indicate in any way that you were interested in advancement to a professional position?

A.  Not that I remember.

Q.  Did you have any discussions with Mr. Wilson about any interest that you had in finding a professional position?

A.  I did, but not within CSC. Whenever he asked me what my goals - - his expression was, "What are you doing to do when you grow up?" And at that time - - like I said, the M.B.A. degree was so broad - - I really at that didn't - - I didn't really know what I wanted to branch out into. So I couldn't really tell him what exactly I wanted to do.

Q.  Did you talk to him about looking for a professional opportunity outside of CSC?

A.  Hopefully, yes. After I got my degree, I wanted to do something, but at that time I didn't know what I wanted to do.

Q.  Did you talk to him at all about any interest that you would have in a professional position within CSC?

A.  I don't remember having that kind of discussion with him.

Q.  Did you have any discussion with anybody at CSC about an interest in a professional position?

A.  Within CSC?

> Q. Yes.
>
> A. I don't remember having a conversation with anybody.
>
> Q. Is there a reason that you didn't discuss - -
>
> A. Yes, there is. And in the history of CSC, I have never really known them to - - an administrative person to go from administrative to that - - to a professional position. Positions were so limited and - - so it was really like you had no choice once you go your degree - - and I guess in my mind I thought that once I got my degree, I would have to leave CSC, because what could I do there. It was mostly an engineering firm, and the support jobs just weren't there. And I was often told, "You will probably have to leave CSC, because these are mostly engineering jobs" - - by various managers.

*Plaintiff's Deposition*, pp. 50-52. The plaintiff might not have remembered stating that she wanted or expected to advance within CSC, but Freeman testified that she told him so, and because of that, she was told of the opportunity for promotion into Business Development. In a letter the plaintiff wrote when applying for another job, she set out those things she had learned in Business Development. Moreover, Brand was qualified for Noneman's job, as Brand had performed Noneman's duties when Brand worked for one of CSC's subcontractors.

With respect to a prior scheme by management to promote Brand, Savage testified:

> R. Did you, or anyone else at CSC, to your knowledge, communicate with Ms. Brand that there was a possibility that she could advance from that position?
>
> A. No.
>
> Q. But, in fact, as events actually turned out, she was able to advance when Ms. Noneman moved on to a different responsibility?

> A. That is correct.
>
> Q. Would it be your best understanding and testimony that there was no anticipation when Ms. Brand was hired that Ms. Noneman might move on?
>
> A. That is correct. We did not anticipate any change.

*Savage Deposition*, p. 19.

It is concluded that the plaintiff's claim that discrimination was behind the plaintiff's promotion, the bringing in of Brand, and Brand's moving into Noneman's job, is unsustainable.

*Laying off the plaintiff*: The plaintiff claims that when she was laid off, seven comparable white employees remained in jobs for which they had been recently selected and she was qualified to perform. She complains that most of those jobs were filled without consideration of her. The plaintiff names Pamela Bolasevich, Sandra Brand, Ohlvia Corder, Janet Frieze, Jackie Horton, Charlotte Moorehead, and Pamela Nettles.

> Generally, a plaintiff in a job-reduction case can establish a prima facie case by demonstrating (1) that he was in a protected age group and was adversely affected by an employment decision; (2) that he was qualified for his current position or to assume another position at the time of discharge or demotion; and (3) evidence by which a fact finder might reasonably conclude that the employer intended to discriminate on the basis of age. Where a particular job position is entirely eliminated for nondiscriminatory reasons, for plaintiff to prevail against his employer he must show that he was qualified for another available job with that employer; qualification for his current position is not enough.

*Early v. Champion International*, 907 F.2d 1077, 1082-83 (11th Cir. 1990). The court pointed out that "the essence of a RIF is that competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired." *Early*, 907 F.2d

at 1083 (*quoting Healy v. New York Life Insurance Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988)).

The plaintiff was given her lay-off notice on June 2, 2000. Because most, if not all, of the positions in question were filled before the plaintiff was laid off and were therefore unavailable to the plaintiff, the defendant asserts that the plaintiff cannot establish a prima facie case of RIF discrimination. The plaintiff, however, claims that these positions were *created* to protect white employees from lay-off. It was held in *McDonnell Douglas* that a plaintiff may establish a prima facie case of discrimination "by showing that (1) he is a member of a protected class, (2) he was subjected to an adverse job action, (3) his employer treated similarly situated employees outside his classification more favorably, and (4) he was qualified to do the job." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Both the plaintiff and the defendant discuss the third factor of this prima facie test, which is whether or not these seven persons are "comparators."

The defendant explains that Moorehead was placed in a position in the Program Control Group when her job was threatened as a result of the merger. The plaintiff claims she was more qualified than Moorehead because of her part-time work with the Program Control Group, and because she had a college degree. Moorehead, however, had been a supervisor in the Facilities Division of CSC, and a "Member of the Professional Staff" for several years longer than Matthews. Moreover, the functions Moorehead performed in the Facilities Division and those she was performing in the Program Control Group were very similar. Also, as the plaintiff stated that her college degrees were wasted in Program Control Group, those degrees were of little, if any, value in performing Moorehead's job.

As to Bolasevich, Freeman merely enlarged her part-time duties so that she could

-10-

charge directly to the SETAC contract on a full-time basis. Also, the defendant points out that since the plaintiff states that Bolasevich's job was a step back from the plaintiff's job in Business Development, she cannot claim that the person who filled it was similarly situated.

The defendant asserts that consideration of the plaintiff's lay-off protection claim is limited to Moorehead and Bolasevich because the plaintiff named only Moorehead and Bolasevich in her discrimination charge. As a general rule, Title VII plaintiffs cannot bring claims in a lawsuit that were not included in the EEOC charge. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L. Ed. 2d 147 (1974). Further, the scope of a civil complaint is limited to the scope of the EEOC investigation that can be expected to grow out of the discrimination charge. *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985). Therefore, if the additional charges in the civil complaint arise naturally and logically from the facts presented to the EEOC, they are related to the original charge. *White v. Wells Fargo Guard Services*, 908 F. Supp. 1570 (M.D. Ala. 1995). From a practical standpoint, one of the most important considerations is "whether the defendant had sufficient notice from the administrative charge of the alleged kinds and areas of discrimination ." *White*, 908 F. Supp. at 1581, *quoting Brown v. Walt Disney World Co.*, 805 F. Supp. 1554, 1558 (M.D. Fla. 1992) (*quoting Jiron v. Sperry Rand Corp. (Sperry-Univoc)*, 423 F.Supp. 155, 159 (D. Utah 1975).

The plaintiff does not argue this issue, but if it is proper to consider the plaintiff's allegations concerning the other persons because those allegations "arise naturally and logically" from the EEOC claim that Moorehead and Bolasevich got jobs the plaintiff should have had, the qualifications and situations of those persons are set out in the parties' briefs and will not be set out in this memorandum of decision. It appears that none of the other

named persons is a "comparable," and that the plaintiff has not established a prima facie case of race discrimination as to any of the eight positions. Even if the plaintiff had established that one or more of these persons were comparators, this claim would still fail because of the lack of evidence of actual discrimination, as explained *infra*.

*Miscellaneous allegations of discrimination*: The plaintiff contends, or at least did contend, that she did not receive training as a result of discrimination. Her testimony belies that claim.

> Q. So just recapping your testimony, you indicated that your inability to advance you attribute to a lack of training?
>
> A. In the marketing area.
>
> Q. And do you think the lack of training of which you complain was in some way discriminatory and based upon your race?
>
> A. No, sir, I am not - - I did not ever claim that that was - - because I was not trained, that was discriminatory, or based on race.
>
> Q. You understand, don't you, that your lawsuit against Computer Sciences Corporation is predicated on the fact that the company discriminated against you, allegedly on the basis of your race?
>
> A. Yes, sir.
>
> Q. You understand that?
>
> A. Yes, sir.
>
> Q. And my question is: Are you aware of any information upon which you base a claim or belief that CSC did not provide training to you because of your race?
>
> A. No. sir. I don't have any knowledge of that.

*Plaintiff's Deposition,* pp. 223-24.

As the defendant states, the record lacks any evidence that the plaintiff was paid less than Brand, and, therefore, no prima facie case has been made as to disparate compensation. The same is true for pay raises. The plaintiff claims that Freeman promised her another pay increase upon her graduation from Alabama A & M. Freeman testified that he was unable to secure a pay raise simply for the award of the degree because it would have been an out-of-cycle pay raise. The plaintiff points to Gwen Hume, who received an out-of-cycle pay raise. Freeman explained that Hume received an out-of-cycle pay increase because of her promotion, just as the plaintiff received an out-of-cycle pay raise when she was promoted. Moreover, Hume, like the plaintiff, is black.

*Insufficient evidence of discrimination*: Even if the plaintiff had made out a prima facie case of discrimination as to any of her claims, she has not presented evidence of discrimination sufficient to overcome the non-discriminatory reasons given by the defendant for the actions complained of.

With respect to those jobs the plaintiff states she should have been awarded and which would have saved her from lay-off, the Eleventh Circuit set out the law concerning claims of discrimination based on qualifications:

> Other circuits have more clearly articulated the evidentiary burden a plaintiff must meet in order to prove pretext by showing she was substantially more qualified than the person promoted. *See Fulton County*, 207 F.3d at 1340. In *Deines*, for example, the Fifth Circuit affirmed the district court's instruction to the jury stating that "disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." 164 F.3d at 280.

*Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000). Even if the plaintiff were qualified for those jobs, the difference in her qualifications and those persons who got the jobs are not so great as to allow a finding of discrimination.

Finally, there is simply a lack of evidence of race discrimination in this case. The plaintiff's lay-off was simply unfortunate. Even the plaintiff's immediate boss, Ozment, a white person, was laid off. The plaintiff seemed to recognize the indiscriminate falling of the axe when she stated that when companies merge "the result is a scrambling for jobs as new leaner business entities get organized. It is like a game of musical chairs in which those who do not have connections might be left out." *Plaintiff's Declaration*, p. 2. Although it might be, from the plaintiff's viewpoint, that Freeman's "advice [to her to accept promotion into Product Development] was a disaster," *Matthews Declaration,* p. 3., Freeman certainly did not intend it to be. The record is replete with instances of Freeman, and others in management, going out of their way to help the plaintiff. At the end, Freeman tried to find a job for the plaintiff.[4] When the plaintiff had faced lay-off the first time, management talked her into staying. The defendant even paid for the plaintiff's college education. Such actions are hardly insidious efforts to get rid of the plaintiff because of her race, rather they loudly bespeak management's desire to keep this plaintiff.

*Conclusion*: For the reasons set out in this memorandum of decision, it is concluded that the defendant's motion for summary judgment is due to be granted. An appropriate order

---

[4]Freeman successfully intervened on behalf of Cowans, whose race is black, when her position was threatened by the merger.

will be entered.

DONE this  4th  day of August, 2004.

*Robert R. Armstrong*
Robert R. Armstrong, Jr.
United States Magistrate Judge